## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED PARCEL SERVICE OF AMERICA, INC.
AND MNX GLOBAL INTERMEDIATE
HOLDINGS, INC.

                    *Plaintiffs*,

        v.

JOHN G. LABRIE,

                    *Defendant*.

C.A. No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs United Parcel Service of America, Inc. ("UPS") and MNX Global Intermediate

Holdings, Inc. ("MNX"), by their undersigned attorneys, respectfully submit this Complaint for

breach of contract and trade secret misappropriation against Defendant John Labrie as follows:

## NATURE OF THE ACTION

1.      John Labrie, the former CEO of MNX, pretended to "retire" but instead became

the CEO of another shipping and logistics company.  On his way out the door, he took a treasure

trove of MNX confidential information and trade secrets.  Labrie forwarded to his personal email

address more than a dozen sensitive documents, including an MNX "competitor assessment," a

"synergy update" presentation, a "people strategy" compilation, and a "2024 strategy"

presentation.  He also solicited other senior MNX executives to join him at his new company.  In

doing so, he violated his legal and contractual obligations to MNX and UPS.  He freely agreed to

those obligations in exchange for substantial compensation when he participated in the sale of

MNX to UPS and when he agreed to continue in his role after the acquisition.  UPS and MNX

attempted to resolve this matter without court intervention, but Labrie denied soliciting the senior

MNX executives and acknowledged taking only a handful of hard copy documents. Given Labrie's misconduct and his lack of full candor, UPS and MNX had no option but to file this lawsuit to protect their rights.

*        *        *

2.      UPS started in a Seattle basement with a $100 loan, and it has grown into one of the largest shipping and logistics companies in the world.

3.      In 2023, UPS acquired MNX to supplement its time-critical courier logistics capabilities. MNX was the first company to provide rapid-flight courier services in 1971 and specializes in providing managed transportation services for shipments that need to arrive within hours rather than days—like cancer medications and airplane parts.

4.      Labrie served as President and Chief Executive Officer ("CEO") of MNX both before and after the acquisition. In these roles, Labrie had unique visibility into MNX's highest-level business and growth strategies, personnel, core logistics knowledge base, network of service providers, carriers, and internal and external subject matter experts. He also had unique access and visibility into all aspects of both companies' strategic plans as part of MNX's integration into the broader UPS business.

5.      To safeguard MNX's assets and talent throughout that process, and in exchange for significant consideration (including his equity interest in MNX), Labrie agreed to a binding Restrictive Covenant Agreement ("RCA") containing, as relevant here, reasonable confidentiality and nonsolicit provisions. The RCA was essential to protecting the value of UPS's newly purchased business (including its confidential information and trade secrets, talent, and customer and employee relationships) if Labrie chose to part within two years of the sale.

6.      Labrie separately agreed to a Retention Bonus Agreement ("RBA"), in which he was eligible to receive substantial consideration and compensation to solidify his employment with

MNX following UPS's acquisition, ensuring to UPS that MNX would have stable leadership while it integrated the company into its business.  The RBA, too, contained reasonable restrictions to protect MNX's confidential information and trade secrets.

7.      As a sophisticated executive with a Master of Business Administration degree and able counsel, Labrie certainly understood his obligations under both the RCA and RBA before and after he promised to uphold them.  Nonetheless, Labrie decided to breach these agreements, hoping UPS and MNX would let it slide.

8.      Less than a month after the MNX acquisition closed, Labrie abruptly resigned, later formally announcing his "retirement" in January 2024.

9.      But Labrie did *not* retire.  Instead, Labrie accepted an appointment as CEO of Quantix Supply Chain Solutions, LLC ("Quantix"), a supply chain services company, which he publicly announced in August 2024.

10.     UPS and MNX have since learned that, in the weeks leading up to his purported "retirement," Labrie began secretly forwarding more than a dozen highly confidential and trade secret MNX documents to his personal email account—continuing to help himself to MNX files containing competitive analyses, integration plans, and compilations of MNX's personnel and talent before and after his last day.

11.     To make matters worse, Labrie, on information and belief, solicited MNX's Chief Commercial Officer (Paul Gettings) and *his own replacement* as CEO (Nate Gesse) to join him at Quantix.  Gettings abruptly resigned from MNX on September 6, 2024 and joined Quantix as CCO on September 8.  Gesse, after resigning on September 12, 2024, likewise popped up as Quantix's COO on January 9, 2025.

12.     On information and belief, Labrie's solicitation from MNX continues.  He has solicited or directed others to solicit an MNX director with a reputation for having the "keys to the castle," who resigned on November 15, 2024, and, on information and belief, is now or will shortly be employed by Quantix, as well as, on information and belief, Greg Peters, MNX's most recent COO who resigned on January 24, 2025, and who MNX has reason to believe will soon start working at Quantix (if he has not already joined).

13.     UPS's and MNX's investigation of Labrie is ongoing.  Over the last two weeks, UPS and MNX have put Labrie and Quantix on notice of Labrie's misappropriation and his ongoing legal obligations to the company.  Labrie has admitted he kept MNX information after his departure and tried to whitewash his conduct by claiming to be just "good friends" with Gesse, Gettings, and Peters.  But given what UPS and MNX have uncovered in their investigation, Labrie's explanations at best strain credulity and at worst are false.  UPS and MNX reserve the right to amend this pleading and bring subsequent action to prosecute any further claims as their investigation continues to unfold.

14.     In the meantime, judicial intervention is necessary to: (1) protect MNX's confidential information, trade secrets, and employee relationships; (2) enforce the reasonable contractual obligations Labrie freely undertook in his RCA as a bargained-for condition of MNX's sale to UPS; (3) enforce the reasonable contractual obligations Labrie freely undertook in his RBA as a bargained-for condition of his continued employment at MNX following the acquisition; and (4) prevent further irreparable harm to MNX from his unlawful conduct.

## PARTIES

15.     Plaintiff UPS is a Delaware corporation with its principal place of business at 55 Glenlake Parkway NE, Sandy Springs, Georgia, 30328.

16.     Plaintiff MNX is a Delaware corporation with its principal place of business at 5000 Airport Plaza Drive, Long Beach, California, 90815.

17.     Defendant John G. Labrie is the CEO of Quantix and former President and CEO of MNX with more than 35 years' experience in the transportation and logistics industry.  He is a natural person who resides and is domiciled in the state of Illinois.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.

19.     This Court also has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367 because UPS's and MNX's claims arise under the laws of the United States and/or form part of the same case or controversy as UPS's and MNX's claims arising under the laws of the United States.

20.     This Court has personal jurisdiction over Labrie pursuant to the forum-selection clause in his RCA, through which Labrie irrevocably submitted to the non-exclusive jurisdiction of the federal and state courts located in the State of Delaware for "any Legal Dispute of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise in any way relating to [the RCA]," which includes breach of the confidentiality and nonsolicitation covenants contained therein.  *See* Ex. A ("RCA") §§ 1, 3(a).  Labrie also has significant Delaware contacts related directly to the facts giving rise to this suit:  Both the RCA and RBA have Delaware choice of law clauses.  *See* RCA § 3(a); Ex. B ("RBA") at 3.   And Labrie was a director and officer of a Delaware corporation when he served as President and CEO of MNX.  As a result, Labrie owed fiduciary duties to MNX under Delaware law, some of which—such as his duty of

confidentiality—continue to this day.  In breaching his restrictive covenants, Labrie harmed MNX, a Delaware corporation, and therefore directed harm into the state of Delaware, as well.

21.    Venue in this Court is proper because the parties contractually agreed that this Court would serve as the non-exclusive venue for this dispute.  RCA § 3(a).

## STATEMENT OF FACTS

**I.    UPS Acquires MNX—Including Its Executives' Goodwill And Years of Experience—In 2023.**

22.    In 1907, UPS was founded in Seattle, Washington, when two teenage entrepreneurs opened the American Messenger Company with a $100 loan.  Today, UPS is one of the world's largest shipping and supply chain management companies, operating in more than 220 countries and territories across the globe.

23.    Over its history, UPS established a culture of shared ownership in the company, a responsibility to help one another and the community, and a commitment to integrity.

24.    On November 2, 2023, UPS acquired MNX to complement its existing subsidiaries (including UPS Healthcare) and to meet the growing demand for logistics services in the biotechnology and healthcare industry.

25.    For over 50 years, MNX had developed a strong track record in providing reliable and timely delivery of mission-critical goods, from airplane parts to the original master of a blockbuster film.    MNX had also developed a specialized expertise in transporting radiopharmaceuticals and temperature-sensitive products, like cancer treatments and COVID-19 vaccines.

26.    UPS's acquisition of MNX immediately increased UPS's capabilities, especially for biotechnology and healthcare customers in the United States, Europe, and Asia.  With MNX's additional expertise and UPS's infrastructure, the companies could continue offering industry-

leading global service to customers who need time-critical, temperature-sensitive logistics solutions.

**II.      Labrie Executes A Restrictive Covenant Agreement To Protect MNX's Assets.**

27.     Because a firm like MNX does not sell a physical product, its success relies on the expertise, relationships, goodwill, and know-how of its senior leadership and personnel, and on the competitive advantage of its confidential business information and trade secrets.

28.     As CEO both before and after UPS's acquisition of MNX, Labrie had unique visibility into MNX's highest-level business strategies, core logistics knowledge base, and network of service providers, carriers, personnel, and internal and external subject matter experts. He also had unique access and visibility into all aspects of both companies' strategic plans as part of MNX's integration into the broader UPS business.

29.     UPS, therefore, needed assurance that it would receive sufficient time to protect the MNX assets—both talent and confidential business information—and that Labrie as CEO could not turn around and pillage key pieces as soon as he cashed his check from the acquisition.

30.     To that end, Labrie and UPS entered into a Restrictive Covenant Agreement ("RCA") on September 26, 2023. *See* RCA.

31.     Labrie acknowledged in his RCA that "as a direct equity holder" of MNX, he "will receive significant valuable consideration as a result of the transactions contemplated by the Purchase Agreement." RCA (recitals).

32.     And in exchange, Labrie agreed to be bound by a series of reasonably tailored restrictive covenants to protect MNX's assets.

33.     *First*, Labrie agreed not to use UPS or MNX's confidential information or disclose it to any person who was not an employee, contractor, agent or affiliate of UPS, without the prior

written consent of UPS, for a period of two years after the November 2, 2023 closing date of MNX's acquisition by UPS (i.e. until November 2, 2025).  RCA §§ 1, 2(a).

34.    *Second*, he agreed, for the same two year period, not to directly or indirectly: (1) "solicit or attempt to solicit any business from any Person who was a customer, as of the Closing Date or at any time during the one-year period prior to the Closing Date, for purposes of providing products or services that are directly competitive with the Company Activities"; or (2) "on behalf of [himself] or any other Person, directly or by assisting others, recruit or solicit, or attempt to recruit or solicit, any Person who was an employee of the Company on the Closing Date or at any time during the one-year period prior to the Closing Date or is an employee of [MNX, UPS, or UPS's other subsidiaries] during the Term [beginning on the closing date and ending on November 2, 2025]."  RCA §§ 1, 2(b)(4).

35.    And *third*, he agreed to remain contractually bound, for a period of two years after the closing date of MNX's acquisition (until November 2, 2025), not to "directly or by assisting others, own, manage, join, assist, or conduct [next-flight-out services, courier managed transportation services, or service parts logistics]" in the geographic territories specified in the definitions, "or otherwise engage in, have an equity or profit interest in, loan money to or render services . . . to or on behalf of any Person or entity engaged in the same or substantially similar [activities]."  RCA §§ 1, 2(b)(3).

36.    *Finally*, Labrie acknowledged that it was "essential" he "enter into" the RCA in order "to adequately protect [UPS's] legitimate business interests and financial investment in [MNX], including, but not limited to [UPS's and MNX's] relationships with their employees, contractors, customers, suppliers, vendors, and agents, as well as [UPS's and MNX's] goodwill, Confidential Information . . . , proprietary information, and Trade Secrets."  RCA § 1.

**III.     Labrie Also Executes A Retention Bonus Agreement To Lead MNX Forward Within UPS.**

37.     Beyond seeking to prevent Labrie from raiding MNX, UPS also sought to ensure a smooth transition and integration of the company into its wider organization.

38.     A key group of executives led MNX at that time, including Labrie; Nathan Gesse, the Chief Operating Officer; and Paul Gettings, the Chief Commercial Officer.  They had spent years at MNX, developing the private equity-backed firm into an attractive asset for a large publicly traded logistic company.  (Indeed, this was the dream result, as it is a well-trodden path for many in private equity-backed c-suites: grow a company over a period of years, get acquired by a larger company, and exit with substantial cash and the chance to grow within a bigger organization.)

39.     To promote continuity of leadership and goodwill, and to foster trust with the individuals most responsible for driving MNX forward, UPS quickly sought to solidify those executives' future positions in the company with generous six- and seven-figure retention bonus agreements.

40.     In exchange for these bonuses, as well as continued employment and additional consideration, Labrie (and others) also agreed to abide by an Employee Proprietary Information, Non-Solicitation and Non-Competition Agreement.  *See* RBA.

41.     Stated simply:  while Labrie's RCA protected the MNX asset (talent, confidential information, goodwill, and trade secrets) on a backwards-looking basis at the time of acquisition, Labrie's RBA protected MNX moving forward, as well.

42.     Labrie, therefore, agreed in his RBA that he "shall not, without the express prior written consent of [the] Company, directly or indirectly, disclose to any person or entity or, except as necessary to perform my duties as an employee of [the] Company, make use of for [himself] or

any other person or entity, (i) any Confidential Information during the term of this Agreement and for a period of two (2) years immediately following the termination of [his] employment with [the] Company; and (ii) any Trade Secrets during the term of this Agreement and for so long thereafter as any particular Trade Secret retains its status as a trade secret under applicable federal, state or local law." RBA § (A)(2).

43.     Labrie further agreed that all trade secrets disclosed or made available to him "shall be and remain the property of [the] Company and shall be promptly returned to [the] Company" upon the termination of his employment or the company's request.  RBA § (A)(3).

44.     He "expressly acknowledge[d] and agree[d] that [the] Company's Trade Secrets and Confidential Information have actual or potential economic value from not being generally known or readily ascertainable and are the subject of reasonable efforts by [the] Company to maintain their secrecy."  RBA § (A)(2).

45.     And Labrie acknowledged that the covenants in the RBA were "a necessary means to protect [the] Company's interests in its Trade Secrets," and that "any breach by [Labrie] of any of [the] covenants will cause irreparable harm and injury to [the] Company and will leave [the] Company with no adequate remedy at law."  RBA § (E).

## IV.     MNX Takes Reasonable Precautions To Protect Its Trade Secrets And Other Highly Confidential Information.

46.     In addition to agreements like the RCA and RBA that Labrie (and other executives) signed, both UPS and MNX implemented a robust infrastructure of agreements, policies, and technological safeguards to maintain the secrecy of MNX's valuable trade secrets and other confidential information.

47.     For instance, MNX requires all employees, upon commencing employment, to execute a confidentiality agreement requiring the employee to safeguard the company's trade

secrets and confidential information, and requires agreements with suppliers, partners, and potential business partners to contain clauses preserving the confidentiality of the company's information.

48.    MNX also maintains an Information Security Program, which consists of policies that safeguard the company's information assets. Policies comprising the Information Security Program cover topics including:

- Acceptable uses of computers and network services;
- Data and information classification;
- Data protection;
- Password requirements;
- Mobile device use by employees;
- Use of personal devices by employees;
- Email use by employees; and
- Return of MNX property following end of employment.

49.    To access MNX's computer systems, MNX employees must enter a password that must be changed at least every 60 days.

50.    And once logged into an MNX computer, access to MNX's information assets is based on the principle of least privilege, which limits each user's access to the minimum amount necessary to perform the user's assigned job duties.

## V.    Labrie "Retires," But Then Joins A Private Equity-Backed Logistics Firm And Solicits MNX's Senior Executives.

51.    After UPS's acquisition of MNX closed on November 2, 2023—and instead of staying on to integrate MNX and realize its success within UPS as the company had envisioned with his RBA—Labrie abruptly resigned on December 1, 2023.

52.    Labrie represented to his colleagues within MNX and UPS that he was "retiring." UPS issued an organization-wide email, noting that Labrie planned to retire "after a 35-year career

in the transportation industry" while also announcing that Nate Gesse would be promoted to President and MNX Chief Executive Officer.

53.    On August 23, 2024, however, UPS and MNX learned that Labrie had apparently come out of "retirement" when Quantix—a self-described leader in the supply chain services industry—publicly announced his appointment as its new President and CEO.  Quantix's press release boasted that Labrie "brings extensive experience running large-scale global transportation and logistics businesses."

54.    Labrie had clearly recognized that he continued to be bound by ongoing contractual obligations to MNX when he sought and accepted his appointment at Quantix.

55.    On April 10, 2024, for example, in connection with his discussions with the private equity firm AEA Investors, LP, Labrie sent an email to Tim Whelan (AEA Investors partner), thanking him for the "potential opportunities to work together" and forwarding a copy of his RCA for Whelan's attorneys to review.

56.    And on July 12, 2024, Labrie sent himself a reminder email to "Send non compete."

57.    Nonetheless, just weeks after Quantix brought Labrie on as its CEO, Gettings resigned from his position at MNX.

58.    Two days later, on September 8, 2024, Gettings posted on LinkedIn that he had been hired as Quantix's new Chief Commercial Officer under Labrie—the same role Gettings had long held at MNX.

59.    Since then, UPS and MNX have learned that, in the eight months between Labrie's departure from MNX and his joining Quantix, he stayed in close contact with Gettings and his former MNX colleagues and key executives.  In April 2024, for example, Labrie, Gettings, and

Gesse attended a private equity-hosted trip to Las Vegas to celebrate their profits from MNX's acquisition by UPS.

60.    Indeed, one of Gettings's LinkedIn followers commented on his Quantix announcement that it was "great to see the dream team [i.e., Labrie and Gettings] will stay together."  Gettings "liked" the comment.

61.    Gesse—a third member of this "dream team"—would not be left out for long.  On January 9, 2025, Quantix announced via LinkedIn that it had hired Gesse as its Chief Operating Officer after Gesse had resigned from MNX a few months prior.

62.    The LinkedIn love fest continued—Gettings reposted Quantix's announcement about Gesse, adding: "We are building a team of Champions at Quantix."  Many of Gettings's LinkedIn followers commented that he and Labrie were "getting the band back together."  Gettings even "liked" a comment expressing that Quantix was "lucky" to have MNX's "A team back together."  And a current MNX employee remarked, "Big Catch! Congrats on getting the band back together!"

63.    Given the timing, circumstances, and the executives' roles, it was clear that Labrie had solicited (or directed others to solicit) Gettings and Gesse to join him at Quantix.

64.    And Labrie did not, apparently, stop with the "dream team."  Over the past few months, on information and belief, he—either directly or through others—has continued to poach additional MNX employees for Quantix.

65.    In December 2024, for example, MNX's Chief Operating Officer, Greg Peters, submitted his resignation, effective January 24, 2025.  On information and belief, Peters is planning to work at Quantix.

66.      MNX also has reason to believe that at least one additional senior employee—a director with a reputation for having the "keys to the castle"—who resigned from their role at MNX in November 2024 is working for Quantix.

**VI.    UPS And MNX Discover That Labrie Stole A Treasure Trove Of Trade Secrets And Other Confidential Information On His Way Out.**

67.      With Labrie, Gettings, and Gesse joining Quantix in rapid succession—and the companies' understanding that Quantix continues to poach MNXers—UPS and MNX launched a broader investigation into Labrie's conduct surrounding his departure.

68.      UPS and MNX have now uncovered damning evidence that Labrie—far from planning to "retire" when he resigned from MNX—had been helping himself to MNX's confidential information and trade secrets while plotting his next move.  Over a period of two months before and surrounding his resignation, Labrie surreptitiously forwarded more than a dozen of MNX's most sensitive documents to his personal email address without the company's knowledge or authorization.

69.      The only plausible explanation for Labrie's misappropriation is that he intended to use—and on information and belief is using—MNX's confidential information and trade secrets for his own personal benefit and, likely, for Quantix's.

70.      While UPS's and MNX's investigation remains ongoing, this much is now clear:

71.      On December 21, 2023, Labrie forwarded a copy of an "integration update" presentation to his personal email address.  That document expressly warns that the presentation is "Proprietary and Confidential."  It presents MNX's projected revenues, savings, and costs post-integration, as well as key financial indicator results.  And it details specific near-term cost synergy plans, as well as the status of such projects.

14

72.    The next day, December 22, 2023, Labrie forwarded to his personal email address:

- a copy of an MNX operations review, which warns that the presentation is "Confidential and Proprietary" and presents detailed MNX financial data , investment and business expansion strategies, and—most concerningly—a compilation of accounts at risk;

- copies of three documents relating to MNX's August 2023 financials and monthly trends, which also expressly warn that they are "Private & Confidential" and present MNX's financials, compilations of confidential customer data, and compilations of confidential employee data, projections, and performance; and

- a copy of an MNX competitor assessment.

73.    On January 4, 2024—the same day MNX circulated an internal organizational announcement that Labrie would "retire after a 35-year career in the transportation industry"— Labrie emailed Keith Prusek and Hugh Rabb (a pair of Jefferies Group investment bankers who specialize in the logistics and transportation sector) that he was "look[ing] forward to meeting the appropriate people at the PE [Private Equity] shops we have discussed," and "from [his] perspective that can happen whenever it makes sense."

74.    The next day, on January 5, 2024, Labrie worked his last day at MNX.  MNX permitted him to retain access to his laptops and email accounts while he transitioned off serving as a director of several foreign MNX entities and as a signatory on various MNX bank accounts.[1]

75.    But apparently anticipating that MNX would eventually cut off his access to its confidential information and trade secrets, Labrie continued to forward highly sensitive materials to his personal email account with abandon.

---

[1] In this transition period, Labrie's role on these foreign boards was nothing more than a formality; he was not required to attend Board meetings or do any work in his capacity but was occasionally asked to sign some documents.

76. On January 10, 2024, Labrie forwarded to his personal email address, among other things, at least *eleven* strategic documents detailing MNX's "playbook" for growth and strategy, market studies, operations analyses, and integration strategies that MNX used to expand its business, solicit private equity investments, and, eventually, market the company to potential buyers.

77. Several of these documents contain MNX trade secrets, all are confidential, and they include:

- a growth "playbook" document, containing analysis and recommended strategies to grow MNX's revenue, including steps relating to organizational design, HR strategy, and strategic planning;

- a growth strategy document, which likewise contains additional recommendations and strategy, including identifying specific levers for the company to grow, providing a "playbook roadmap" for the company to achieve specific results, and outlining necessary capital investments;

- multiple presentations detailing the "strategic growth levers" that MNX used or planned to use to grow and develop;

- an outline of MNX's value proposition in the time-critical logistics market, compilations of customers, and detailed growth opportunities;

- a detailed description of MNX's facilities and operational capabilities—including compilations of customers and agent partners—and breakdown of MNX's organizational structure by function; and

- a highly detailed strategic plan for growth, analyzing MNX's different business verticals and customers, compiling information about specific MNX customers, outlining MNX's strategy, and compiling financial information relating to specific customers.

78. On January 11, 2024, Labrie continued forwarding to his personal email address, among other things, three additional documents containing MNX's trade secrets and confidential information, including documents analyzing the company's current and future organizational structure, analyses of individual employees and roles, and a spreadsheet compiling stock option

information and performance analyses for employees.

79.    Each of the documents Labrie stole on January 10 and 11 would provide an invaluable blueprint in Labrie's effort to repeat MNX's investment, growth, and acquisition strategy at a competing logistics firm.  Indeed, when these documents were initially circulated within MNX, Labrie himself recognized that they were "highly sensitive:"

Guys,

Please be smart about the use of these given the highly sensitive nature of some slides.

Thanks,
**John Labrie**
President & CEO
**MNX** GLOBAL LOGISTICS

That is, Labrie knew what he was doing.

**VII.    When Given The Chance To Explain, Labrie Admits To Keeping MNX Information And Claims He's Just "Good Friends" With Gesse And Gettings.**

80.    As part of UPS and MNX's ongoing investigation, UPS and MNX contacted Labrie through counsel to remind him of his ongoing legal obligations and request an explanation.

81.    Labrie confirmed through counsel that he is CEO of Quantix and on its Board of Directors, responsible, as he was at MNX, for "all aspects of day to day operations in all locations" with "regular engagement with customers, particularly Quantix's top 5-10 customers."  He did not mention the treasure trove of sensitive files he sent to his personal email address on his way out the door.

82.    Labrie also admitted that he retained MNX hard-copy information and MNX laptops, but certified that he had returned or was going to return "[a]ll company materials."

83.    And as for Gesse, Gettings, and Peters, Labrie admitted he "has had contact" with them "as they all remain good friends," but he claims that "[n]one of these individuals were

contacted in violation" of his RCA.  Labrie presumably asks UPS and MNX to believe that it was coincidental that two of these "good friends" ended up at the company where Labrie serves as CEO by coincidence without any solicitation by Labrie.

84.     But given what UPS and MNX have uncovered in their investigation, Labrie's representations are disingenuous at best and outright false at worst.

85.     It strains credulity, for example, to believe that Labrie had no involvement in recruiting Gesse and Gettings to Quantix's c-suite alongside him.  It simply cannot be the case that Labrie never "assisted" Quantix in recruiting Gesse and Gettings as he was regularly spending time with them in Las Vegas and elsewhere—when Labrie is "responsible" for Quantix and they just so happened to join under Labrie within months of his arrival.

86.     And as for MNX's confidential information and trade secrets, Labrie has admitted he kept at least hard copy documents—which he is sending back now, over one year post-"retirement."  It is also highly suspect that he did not even address his misappropriation of the many documents he surreptitiously forwarded to his personal email address on his way out.

87.     In short, far from placating UPS and MNX, Labrie's apparent misstatements and omissions continue to raise the alarm.

## VIII.    MNX Will Continue To Suffer Irreparable Harm From The Misappropriation Of Its Trade Secrets And Confidential Information And Unlawful Employee Solicitation.

88.     UPS and MNX have already had to expend significant resources to identify and investigate Labrie's misconduct and prepare to redress his misdeeds.  But their investigation is ongoing (for which UPS and MNX reserve all rights to amend their allegations, defendants, and claims)—and the evidence uncovered to date is likely the tip of the iceberg.

89.     Quantix, like MNX, specializes in managed transportation and logistics services, including the transportation of hazardous and other heavily regulated materials.  And as was MNX

historically, Quantix is a private equity-owned shipping and logistics company. The trade secrets and confidential information that Labrie stole contain, among other things, the details of MNX's business, including its strategies for expansion and to position itself—as a private equity-owned shipping and logistics company—for acquisition by UPS.

90.     Should Labrie disclose, use, and integrate MNX's trade secrets and confidential information to build Quantix, MNX will further lose control of its intellectual property—causing irreparable harm and endangering the legal status of MNX's trade secrets. Indeed, Labrie agreed in the RBA that his breach of the confidentiality covenants would "cause irreparable harm and injury to [the] Company" and would "entitle [the] Company to . . . injunctive relief in any court of competent jurisdiction." RBA § (E).

91.     What's more, Labrie's continued solicitation of talent at MNX for Quantix in violation of his RCA will diminish UPS's MNX asset—which it and Labrie entered into the RCA to protect. Labrie has now poached his former second and third in command, reuniting the trio at Quantix—with additional MNXers, on information and belief, to follow.

92.     In short, the current and ongoing risks to UPS and MNX are real, and the harm to MNX's business are—and, absent injunctive relief, will continue to be—irreparable.

**Count I – Breach Of Contract - Confidentiality (Restrictive Covenant Agreement)**

93.     MNX and UPS repeat and reallege the foregoing paragraphs as if fully set forth herein.

94.     The RCA is a valid and binding contractual agreement, as described above.

95.     MNX fully performed its obligations under the RCA.

96.     The RCA was made for valid consideration, including the compensation Labrie received as a result of MNX's acquisition by UPS.

97.    The RCA defines "Confidential Information" to mean any "non-public and confidential or proprietary information" related to MNX, UPS, or their affiliated entities, including "financial, technical, sales, marketing, development and personnel information, customer lists, supplier lists, designs, product formulations, product specifications, terms of arrangements with customers, terms of arrangements with vendors or suppliers, other data or information of [MNX, UPS, and UPS's subsidiaries] (including Trade Secrets) that is valuable to the operation of [the respective] business and not generally known to the public or competitors and all notes, analysis, compilations, summaries, extracts, studies, interpretations or other materials that contain, reflect or are based upon, in whole or in part, any such information, however recorded or preserved, whether written or oral and regardless of whether or not specifically marked as confidential." RCA § 1.

98.    In the RCA, Labrie promised not to use or disclose any of MNX's Confidential Information to any person who is not an employee, contractor, agent, or affiliate of UPS, without the prior written consent of UPS, for a period of two years after the November 2, 2023 closing date of MNX's acquisition by UPS (i.e. until November 2, 2025). RCA §§ 1, 2(a).

99.    As described in detail above (*infra* ¶¶ 67–79), Labrie breached these provisions of the RCA in the lead up to and after his departure from MNX, including by using his MNX email account to forward more than a dozen of MNX's confidential documents without UPS's authorization and, on information and belief, intentionally using that confidential information for his own benefit after he was no longer an employee and for purposes wholly at odds with his professional obligations to MNX.

100.    MNX has suffered and will suffer damages as a direct and proximate result of Labrie's breach of the RCA, including the loss of its trade secrets and other confidential

information, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law.

101.    MNX seeks an award of all reasonable attorneys' fees expended or incurred in response to Labrie's breach.  RCA § 3(a).

### Count II – Breach Of Contract - Confidentiality (Retention Bonus Agreement)

102.    UPS and MNX repeat and reallege the foregoing paragraphs as if fully set forth herein.

103.    The RBA is a valid and binding contractual agreement, as described above.

104.    UPS and MNX fully performed their obligations under the RBA.

105.    The RBA was made for valid consideration, including UPS's and MNX's promise to pay Labrie a bonus upon the satisfaction of certain conditions.

106.    The RBA defined "Confidential Information" to mean "all tangible or intangible information, whether written, oral or in any electronic, visual or other medium, that is subject to reasonable efforts by the Company to maintain its confidentiality and that (a) relates to [the] Company, [the] Company's activities, [the] Company's business or [the] Company's suppliers or customers; (b) is furnished or made available by [the] Company to [Labrie]; or (c) [Labrie] be[came] aware of as a consequence of or through [his] relationship to [the] Company."  The RBA defined "Trade Secrets" to mean "all tangible or intangible information regarding [the] Company or its activities that meets the definition of 'trade secrets' under applicable federal, state or local law."  RBA § (A)(1).

107.    In the RBA, Labrie agreed not to "without the express prior written consent of [the] Company, directly or indirectly disclose to any person or entity or, except as necessary to perform [his] duties as an employee of [the] Company, make use of for [himself] or any other person or entity . . . any Confidential Information" for two years immediately following the termination of

his employment with the company (i.e. until January 5, 2026).  RBA § (A)(2).  Labrie further agreed not to "without the express prior written consent of [the] Company, directly or indirectly disclose to any person or entity or, except as necessary to perform [his] duties as an employee of [the] Company, make use of for [himself] or any other person or entity any . . . Trade Secrets" for as long as "any particular Trade Secret retains its status as a trade secret under applicable federal, state or local law."  *Id.*

108.    As described in detail above (*infra* ¶¶ 67–79), Labrie breached these provisions of the RBA in the lead up to and after his departure from MNX, including by using his MNX email account to forward more than a dozen of MNX's valuable trade secrets and other confidential information without UPS's authorization and, on information and belief, intentionally used those trade secrets and other confidential information for his own benefit and for purposes wholly at odds with his professional obligations to MNX.

109.    UPS and MNX have suffered and will suffer damages as a direct and proximate result of Labrie's breach of the RBA, including the loss of its trade secrets and other confidential information, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law.

110.    UPS and MNX seek an award of all reasonable attorneys' fees expended or incurred in response to Labrie's breach.  RCA § 3(a).

## **Count III – Breach of Contract - Solicitation (Restrictive Covenant Agreement)**

111.    UPS and MNX repeat and reallege the foregoing paragraphs as if fully set forth herein.

112.    The RCA is a valid and binding contractual agreement, as described above.

113.    UPS and MNX fully performed their obligations under the RCA.

114.    The RCA was made for valid consideration, including the compensation Labrie received as a result of MNX's acquisition by UPS.

115.    Labrie agreed in the RCA, for two years following the November 2, 2023 closing date of MNX's acquisition by UPS (i.e. until November 2, 2025), not to "on behalf of [himself] or any other Person, directly or by assisting others, recruit or solicit, or attempt to recruit or solicit, any Person who was an employee of the Company" on the November 2, 2023 closing date of MNX's acquisition by UPS or was an employee of the company at any time during the one-year period prior to the closing date.  RCA § 2(b)(4)(B).

116.    As described in detail above (*infra* ¶¶ 51–66), Labrie breached these provisions of the RCA following his departure from MNX, including by, on information and belief, soliciting Paul Gettings, Nate Gesse, Greg Peters, and at least one other executive to join him at Quantix.

117.    UPS and MNX have suffered and will suffer damages as a direct and proximate result of Labrie's breach of the RCA, including the loss of its employees, and will continue to suffer irreparable harm as a result of that breach for which there is no adequate remedy at law.

118.    UPS and MNX seek an award of all attorneys' fees and costs resulting from Labrie's breach.  RBA § (E).

## **Count IV – Misappropriation Of Trade Secrets In Violation Of The Defend Trade Secrets Act (DTSA) (18 U.S.C. § 1836)**

119.    UPS and MNX repeat and reallege the foregoing paragraphs as if fully set forth herein.

120.    Labrie misappropriated MNX's trade secrets, including by forwarding the following MNX trade secrets to his personal email address shortly before and after his resignation:

- (i) copies of three documents relating to MNX's August 2023 financials and monthly trends" (*infra* ¶ 72);

- (ii) a copy of an MNX competitor assessment (*infra* ¶ 72);

- (iii) a copy of an MNX operations review (infra ¶ 72);

- (iv) a growth "playbook document" (*infra* ¶ 77);

- (v) a growth strategy document (*infra* ¶ 77);

- (vi) an outline of MNX's value proposition (*infra* ¶ 77);

- (vii) multiple presentations detailing MNX's "strategic growth levers" (*infra* ¶¶ 77, 78);

- (viii) a detailed description of MNX's facilities and operational capabilities (*infra* ¶ 77); and

- (ix) a highly detailed strategic plan for growth (*infra* ¶ 77).

- (x)  documents relating to employee stock options and performance analysis (*infra* ¶ 78)

121.    MNX owns the above trade secrets and relies on them in providing its logistics services in interstate commerce across the country and in global commerce around the world.

122.    MNX's trade secrets, including but not limited to financial results, customer lists, employee performance data and assessments, and business plans and strategies are generated by a substantial investment by MNX of money, time, and energy and derive actual or potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person or business who can obtain economic value from the disclosure or use of that information.

123.    MNX has taken reasonable measures to protect the confidentiality of its trade secrets.  As described above, MNX requires employees to enter into confidentiality agreements prohibiting the use or disclosure of MNX's trade secrets.  Labrie, for example, entered into the Retention Bonus Agreement, which he agreed was "a necessary means to protect [the] Company's interests in its Trade Secrets."  RBA § (E).  Additionally, MNX has robust policies in place that are also designed to protect MNX's trade secrets.  Finally, MNX uses a range of technological

safeguards to ensure that its trade secrets do not fall into the hands of competitors or potential competitors. *See infra* ¶¶ 46–50.

124.    MNX does not consent to the acquisition, disclosure, or use of its trade secrets by anyone other than authorized personnel using them within the scope of the contractual obligations of their employment with MNX.

125.    MNX disclosed and provided its trade secrets to Labrie in confidence, while he was an employee of the company, and pursuant to a duty to maintain the confidentiality and secrecy of that information.

126.    Labrie breached that confidence by improperly acquiring, disclosing and/or using MNX's trade secrets, including by sending MNX's trade secrets from his MNX email account to his personal email account.

127.    Before resigning from MNX, Labrie knew that the documents he sent to himself contained highly valuable trade secrets based on his years of executive experience working for MNX and in the logistics industry.

128.    Labrie knew and was aware of his duties to refrain from disclosing or using MNX's trade secrets.

129.    MNX has suffered harm as a direct and proximate result of Labrie's misappropriation and will continue to suffer irreparable harm if Labrie is not permanently enjoined from retaining, using, or disclosing MNX's trade secrets.

130.    UPS and MNX seek an award of actual damages in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

131.    Further, because Labrie's misappropriation of MNX's trade secrets was conducted through improper means and was willful and malicious, UPS and MNX seek attorneys' fees and

exemplary damages. 18 U.S.C. § 1836(3)(C)-(D).  MNX disclosed to Labrie in the RBA that "[f]ederal law provides criminal and civil immunity to federal and state claims for trade secret misappropriation to individuals who disclose a trade secret to their attorney, a court, or a government official in certain, confidential circumstances that are set forth at 18 U.S.C. §§ 1833(b)(1) and 1833(b)(2), related to the reporting or investigation of a suspected violation of the law, or in connection with a lawsuit for retaliation for reporting a suspected violation of the law." RBA § (A)(2).

### Count V – Misappropriation Of Trade Secrets In Violation Of The Delaware Uniform Trade Secrets Act (DUTSA) (6 *Del. C.* § 2001 *et seq.*)

132.    UPS and MNX repeat and reallege the foregoing paragraphs as if fully set forth herein.

133.    Labrie misappropriated MNX's trade secrets, including by forwarding the following MNX trade secrets to his personal email address shortly before and after his resignation:

- (i) copies of three documents relating to MNX's August 2023 financials and monthly trends" (*infra* ¶ 72);

- (ii) a copy of an MNX competitor assessment (*infra* ¶ 72);

- (iii) a copy of an MNX operations review (infra ¶ 72);

- (iv) a growth "playbook document" (*infra* ¶ 77);

- (v) a growth strategy document (*infra* ¶ 77);

- (vi) an outline of MNX's value proposition (*infra* ¶ 77);

- (vii) multiple presentations detailing MNX's "strategic growth levers" (*infra* ¶¶ 77, 78);

- (viii) a detailed description of MNX's facilities and operational capabilities (*infra* ¶ 77); and

- (ix) a highly detailed strategic plan for growth (*infra* ¶ 77).

- (x)  documents relating to employee stock options and performance analysis (*infra* ¶ 78)

134.    MNX owns and/or lawfully possesses the above trade secrets.

135.    MNX's trade secrets, including but not limited to financial results, customer lists, employee performance data and assessments, and business plans and strategies are generated by a substantial investment by MNX of money, time, and energy and derive actual or potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person or business who can obtain economic value from the disclosure or use of that information.

136.    MNX has taken reasonable steps to protect the confidentiality of its trade secrets. As described above, MNX requires employees to enter into confidentiality agreements prohibiting the use or disclosure of MNX's trade secrets.  Labrie, for example, entered into the Retention Bonus Agreement, which he agreed was "a necessary means to protect [the] Company's interests in its Trade Secrets."  RBA § (E).  Additionally, MNX has robust policies in place that are also designed to protect MNX's trade secrets.  Finally, MNX uses a range of technological safeguards to ensure that its trade secrets do not fall into the hands of competitors or potential competitors. *See infra* ¶¶ 46–50.

137.    MNX does not consent to the disclosure or use of its trade secrets by anyone other than authorized personnel using them within the scope of the contractual obligations of their employment with MNX.

138.    MNX disclosed and provided its trade secrets to Labrie in confidence, while he was an employee of the company, and pursuant to a duty to maintain the confidentiality and secrecy of that information.

139.    Labrie breached that confidence by improperly disclosing and/or using MNX's trade secrets, including by sending MNX's trade secrets from his MNX email account to his personal email and, on information and belief, using the trade secrets for his own benefit after he was no longer an employee and for purposes wholly at odds with his professional obligations to MNX.

140.    Before resigning from MNX, Labrie knew that the documents he sent to himself contained highly valuable trade secrets based on his years of executive experience working for MNX and in the logistics industry.

141.    Labrie knew and was aware of his duties to refrain from disclosing or using MNX's trade secrets.

142.    UPS and MNX have suffered harm as a direct and proximate result of Labrie's misappropriation and will continue to suffer irreparable harm if Labrie is not permanently enjoined from retaining, using, or disclosing MNX's trade secrets.

143.    UPS and MNX seek an award of actual damages in an amount to be proven at trial under 6 *Del. C.* § 2003(a).

144.    Further, because Labrie's misappropriation of MNX's trade secrets was willful and malicious, UPS and MNX seek attorneys' fees and exemplary damages. 6 *Del. C.* § 2003(b).

145.    Additionally, because Labrie's misappropriation of MNX's trade secrets was made in bad faith, willfully, and maliciously, UPS and MNX seek an award of reasonable attorney's fees. 6 *Del. C.* § 2004.

## PRAYER FOR RELIEF

146.    WHEREFORE, UPS and MNX respectfully request that the Court enter an order and judgment against Labrie as follows:

A)      Awarding UPS and MNX permanent injunctive relief, including but not limited to enjoining Labrie from further violating his RCA and RBA and from using or disclosing MNX's trade secrets or confidential information (as defined in the Restrictive Covenant Agreement and Retention Bonus Agreement);

B)      Awarding UPS and MNX actual and compensatory damages in an amount to be determined at trial;

C)      Awarding UPS and MNX exemplary damages and attorneys' fees for Labrie's willful and malicious misappropriation of MNX's trade secrets pursuant to 18 U.S.C. § 1836(3)(C)-(D) and  6 *Del. C.* §§ 2003, 2004;

D)      Awarding UPS and MNX their costs, expenses, and reasonable attorneys' fees pursuant to the RCA and RBA;

E)      Awarding UPS and MNX pre- and post-judgment interest, as applicable; and

F)      Awarding UPS and MNX such further and other relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

147.      UPS and MNX hereby demand a jury trial on all issues so triable.[2]

*[Signature follows on next page]*

---

[2] UPS and MNX acknowledge that, under the RCA, the parties waived a right to a jury trial for any proceeding arising out of or related to the RCA.  But UPS and MNX reserve the right to a jury trial on all other issues so triable.

Dated: February 13, 2025

OF COUNSEL:

JASON C. SCHWARTZ*
THOMAS J. MCCORMAC IV*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036-4504
Telephone:  (202) 955-8500
jschwartz@gibsondunn.com
tmccormac@gibsondunn.com

CHRISTINE DEMANA*
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: (214) 698-3100
CDemana@gibsondunn.com

* Application for admission *pro hac vice*
forthcoming.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: */s/ Timothy R. Dudderar*
    Timothy R. Dudderar (#3890)
    John A. Sensing (#5232)
    Tyler E. Cragg (#6398)
    1313 N. Market Street, 6th Floor
    Wilmington, Delaware 19899-0951
    Telephone:  (302) 984-6000
    tdudderar@potteranderson.com
    jsensing@potteranderson.com
    tcragg@potteranderson.com

*Attorneys for United Parcel Service of America, Inc. and MNX Global Intermediate Holdings, Inc.*